[No. 26551-2-I.   Division One.   April 13, 1992.]

THE STATE OF WASHINGTON, *Respondent*, v. JAMES H. SAMPSON, *Appellant*.

---

*Dennis Benjamin* and *Lorraine Lee* of *Washington Appellate Defender Association,* for appellant.

*David S. McEachran, Prosecuting Attorney,* and *Betty Brinson, Deputy,* for respondent.

SCHOLFIELD, J. — James Sampson appeals his conviction on one count of attempting to elude a pursuing police vehicle, RCW 46.61.024. We affirm.

## FACTS

At about 8:15 p.m. on November 18, 1989, Blaine police officers James Jones and Ernest MacMurray were on patrol in the city of Blaine, Washington. They were in uniform and riding in a fully marked patrol car. The officers observed a motorcycle traveling at a high rate of speed in a 25 m.p.h. zone. The officers attempted to follow the motorcycle and get a "pace" to determine its actual speed. As the officers accelerated to catch up, the motorcycle also accelerated.

At speeds of approximately 50 to 60 m.p.h., the officers were initially able to maintain a steady distance behind the motorcycle. As Officer Jones activated the overhead emergency response lights, the motorcycle lurched forward as if accelerating. After radioing the dispatcher that a possible pursuit was in progress, MacMurray turned on the siren.

The pursuit went through a residential area with several intersecting side streets. The motorcycle passed through several stop signs without stopping.

At one point, the motorcycle slowed down on the gravel shoulder of the road, trying to turn around. Officer Jones angled the patrol car across the roadway in a position head on with the motorcycle, in an effort to block its path. The motorcycle turned and came across the roadway in front of the patrol car, and as Jones spun the car around to try to follow, the right front bumper of the car came within 6 inches of the rear wheel of the motorcycle. Jones testified that the motorcycle gained a pretty good lead on him after the turnaround.

As the pursuit continued, Jones testified that the motorcycle reached speeds of about 95 m.p.h. as it headed eastbound on H Street toward the intersection of Highway 543. The motorcycle went through the intersection — marked by both stop signs and flashing red lights — at what Jones estimated to be about 80 m.p.h. The speed limit in the area was 25 m.p.h. Jones testified that his police car built up speed after clearing the intersection, again reaching speeds of 95 m.p.h. However, he indicated that he was unable to keep up with the motorcycle.

The chase occurred at night. It ultimately involved several Blaine police units and covered approximately 6.4 miles. One of the officers involved in the chase, Officer John Brand, testified that the motorcycle took a "spill" in a construction area behind a gas station, and the rider was unable to get it started again. Brand stated that when he arrived at the scene where the motorcycle had stopped, the driver just put his hands on his head as if to surrender. The driver was later identified as the appellant, 20-year-old James Sampson.

Sampson testified that he had been going to a friend's house when the incident occurred. He stated that he had a helmet on and could not hear anything as he was "out in the open", and could not see behind him due to the positioning of his mirrors. Sampson testified that he had driven past his friend's house, and then attempted to turn around and come

back into the driveway. Sampson testified that he did not see the police car until he turned the motorcycle around. He stated that the police car was coming straight at him and did not look like it was going to stop. Sampson testified that he accelerated to get out of the way of the police car, and then "kind of panicked" and kept on going. The police car, Sampson added, slid over his friend's yard and flew out of control into a grassy area.

Sampson disputed the testimony of the officers regarding his rate of speed. He testified that he never got the motorcycle out of third gear, so he could not have been exceeding 75 m.p.h. Sampson stated that he slowed from about 75 to 35 m.p.h. to cross the intersection at H Street and Highway 543, using his front brake and downshifting to slow down. The compression from downshifting, Sampson testified, caused his rear wheel to lock up, and he left a skid mark about 75 feet long at the intersection. Sampson testified that he did not stop at the intersection, but he did check to see if any cars were coming.

Sampson acknowledged his actions were "stupid". However, he stated that he could control a motorcycle and was in complete control during the entire chase. He testified that he did not consider his actions to be reckless and that he could have taken precautions had another vehicle or pedestrian been in danger. He acknowledged that he did not have a driver's license at the time and that his attempt to evade the police was in part motivated by a desire not to get a ticket.

At the close of the case, defense counsel indicated to the court that, after reading the State's instructions, he added to his proposed instructions an instruction based on *State v. Sherman*, 98 Wn.2d 53, 653 P.2d 612 (1982). Counsel indicated that a *Sherman* instruction was necessary to inform the jury that the wanton and willful disregard element of attempting to elude a pursuing police vehicle must be shown by both an objective and subjective standard, and that circumstantial evidence of the manner of driving creates only a rebuttable inference that the defendant had a

wanton and willful disregard for the lives and property of others.

After a brief recess, the court told counsel that the last instruction provided (presumably the *Sherman* instruction) would be placed in front of the negligent driving instruction and after the intent instruction. Defense counsel asked if the instruction was there yet, and the clerk replied that he had not yet compiled the instruction. The court stated, "He's going to add that to our stacks here while I'm giving the instructions. That's where it's going to go."

The jurors were then brought in, and the court read them the instructions. Although it is unclear whether the court orally read a *Sherman* instruction to the jury, the record indicates that no *Sherman* instruction was ever included in the written packet given to the jury.

In closing argument, defense counsel argued that the only issue in the case was the characterization of Sampson's state of mind. He went through the elements of the attempting to elude charge, discussing and defining the elements of willfully and wantonly. He argued that Sampson had been only negligent, and urged the jury to find him guilty of the offenses of operating a vehicle in a negligent manner and failing to obey a police officer.[1]

The jury found Sampson guilty of attempting to elude a pursuing police vehicle. This appeal followed.

### Failure To Give *Sherman* Instruction

The crime of attempting to elude a pursuing police vehicle, or felony flight, is defined as follows:

> Any driver of a motor vehicle who wilfully fails or refuses to immediately bring his vehicle to a stop and who drives his vehicle in a manner indicating a wanton or wilful disregard for the lives or property of others while attempting to elude a pursuing police vehicle, after being given a visual or audible signal to bring the vehicle to a stop, shall be guilty of a class C felony.

RCW 46.61.024, in part.

---

[1] The jury was instructed on these lesser included offenses in instructions 11 through 14.

In *State v. Sherman*, 98 Wn.2d 53, 653 P.2d 612 (1982), the court held that the mental element of felony flight under RCW 46.61.024 contains both objective and subjective elements. *Sherman*, at 58. The court reasoned that while a defendant's manner of driving may *indicate* a wanton and willful disregard, the actual mental element would not be present if, for example, the defendant's behavior was the result of a seizure while driving. *See Sherman*, at 59. For that reason, the court concluded that the jury should be instructed that circumstantial evidence of the manner of one's driving creates only a rebuttable inference that the defendant had " 'wanton and wilful disregard for the lives or property of others . . .' ".[2] *Sherman*, at 59.

Sampson argues that defense counsel was ineffective for failing to ensure that the written *Sherman* instruction was included in the instructions given to the jury. He also contends that the trial court's failure to give the *Sherman* instruction was prejudicial error. We disagree with both contentions.

■ If a defendant presents no evidence to rebut the inference from circumstantial evidence that he drove with wanton or willful disregard, the jury has no evidence to which to apply a *Sherman* instruction. In *Sherman*, the defendant offered no evidence that he was subjectively unaware of and not responsible for the acts he was performing:

> Thus, even if the jury found his driving only "indicated" a wanton and willful disregard, Sherman presented no evidence to rebut the inference from the manner in which he drove that he *actually* drove with wanton and willful disregard. . . .
>
> . . . .
> . . . If we were to remand, Mr. Sherman would simply be convicted on the same evidence that was presented at the first trial.

*Sherman*, at 57, 60.

---

[2]Effective July 10, 1982, RCW 46.61.024 was amended to change "wanton and wilful" to "wanton or wilful". *See State v. Stayton*, 39 Wn. App. 46, 48 n.1, 691 P.2d 596 (1984), *review denied*, 103 Wn.2d 1026 (1985).

From the evidence presented at trial, the clear inference here is that under the objective prong of the analysis, Sampson's driving "indicated" a wanton or willful disregard. The only issue is whether Sampson presented evidence to rebut that inference and show that he did not actually possess the required mental state.

Sampson argues that his testimony at trial showed that he stopped at one intersection, slowed down at another and checked both ways, and was concerned for his safety. He further argues that he would have felt bad had he caused another person's death. All this evidence, he argues, went to his subjective mental state and provided circumstantial evidence to rebut the element of wanton and willful disregard.

We disagree. Sampson admitted to driving at least 75 m.p.h. — three times the speed limit — in attempting to evade the officers. He further admitted to skidding at least 75 feet through one intersection in an attempt to slow down. It is undisputed that these actions were intentional. No evidence was offered to show that Sampson had no subjective intent to drive as he did, or that he was unaware of or not responsible for his acts. *See Sherman,* at 57.

Sampson additionally argues that his testimony that he "panicked"[3] when he first saw the police car amounted to evidence of his mental state to rebut any inference of wanton and willful disregard created by his manner of driving. He likens this "panic" to the example given in *Sherman* of the defendant suffering from a seizure. *See Sherman,* at 59. Therefore, he argues that a *Sherman* instruction was necessary for the jury to evaluate the evidence.

However, it is clear from Sampson's testimony that it was not "panic" that compelled him to continue to attempt to elude the police vehicle over the course of the 6.4-mile chase. Sampson testified that after he noticed the police car

---

[3]Dictionary definitions of "panic" describe it as a condition characterized by hysterical or unreasoning fear. We express no opinion as to whether panic could ever be so severe as to make resulting conduct unintentional.

and nearly collided with it, he drove away, thinking about what he was doing. He testified that he was in complete control of the motorcycle from the beginning of the chase until the end. At one point, Sampson testified, he was no longer worried about the police because they were so far behind him and did not seem to know where he was. Defense counsel asked him why he didn't stop:

Q: So why didn't you stop for them at this point?
A: My adrenaline was already going, and it wasn't — it just — I don't know why I didn't really stop; I just didn't. Just kept going.
    Well, for one, I didn't have a license. I thought, well, this might give me a little more time to get a license, if I could get away.
Q: You didn't want to get a ticket.
A: Sure.
Q: So you tried to get away.
A: Right.

Whatever "panic" Sampson may have experienced early on, his testimony indicates that it was short lived. The objective evidence regarding the manner of Sampson's driving overwhelmingly indicates that he actually possessed the mental state of wanton or willful disregard. Sampson's testimony reinforces this evidence; it does not rebut it.

Because Sampson failed to produce any evidence demonstrating that he had no subjective intent to drive in the manner in which he drove, the jury had no evidence to which to apply a *Sherman* instruction, and the trial court's failure to provide it was not error.

Judgment affirmed.

PEKELIS and BAKER, JJ., concur.